*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STACY HAWKINS,

Plaintiff-Appellant,

v

CITY OF SAGINAW, OFFICER STEVEN
LAUTNER, DETECTIVE NATASHA MCNAB,
ISAAC HEINZ, and REBECCA HEINZ,

Defendants-Appellees.

UNPUBLISHED
December 15, 2025
2:39 PM

No. 374361
Saginaw Circuit Court
LC No. 2024-001964-NO

Before: SWARTZLE, P.J., and O'BRIEN and BAZZI, JJ.

PER CURIAM.

Plaintiff, Stacy Hawkins, appeals as of right the trial court's order granting summary disposition to defendants, City of Saginaw (the City), Officer Steven Lautner, Detective Natasha McNab, Isaac Heinz, and Rebecca Heinz (jointly, Heinz defendants), (collectively, defendants), under MCR 2.116(C)(8) (failure to state a claim on which relief can be granted), and dismissing plaintiff's claims with prejudice. We affirm in part, reverse in part, and remand for further proceedings.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The following factual allegations are taken from the plaintiff's complaint and other matters in the record. On October 18, 2023, plaintiff's pregnant girlfriend, Patricia McQueen, was involved in an altercation with the father of her children, Tommie Lee Jackson III, at his residence located in Saginaw, Michigan. While McQueen was sitting in her vehicle, Jackson and McQueen initially had a civil conversation; however, Jackson subsequently "began punching the car so hard that the lights on the car and the radio began flashing on and off with each punch." Jackson further punched McQueen in the face through the open car window, and "then punched towards the rear of the car and punched their 4-year-old son in the face." McQueen drove away from the premises, contacted emergency services, informed the 911 agent of what transpired, and directed the police to her residence located at 622 South Bond Street, Saginaw, Michigan.

Officers from the Saginaw Police Department, including Officer Lautner, arrived at McQueen's home and interviewed McQueen and her children. Plaintiff was present at the residence and he overheard McQueen detail the alleged assault involving Jackson to the officers. The officers then went to Jackson's home, where Jackson and his friends informed law enforcement that "there was no confrontation" between Jackson and McQueen, rather, McQueen "just drove up and began screaming at him then tried to hit him with her car," and, "she would have hit him with the car but stopped for the tree." The officers returned to McQueen's residence and "they told her they were placing her under arrest for attempting to hit [Jackson] with the car," without seeking additional information from McQueen. McQueen was charged with felonious assault, MCL 750.82. Plaintiff subsequently called one of McQueen's friends, Tonya Nemitz, to clarify what occurred during the confrontation between McQueen and Jackson, as Nemitz witnessed the incident from her vehicle. Nemitz confirmed that Jackson "was punching McQueen's car so hard that the lights on the car were blinking off and on," but she did not see Jackson punch McQueen.

Based on the foregoing information, plaintiff contacted the Saginaw Police Department, and he requested that an officer speak to Nemitz; but Officer Lautner, who did not return plaintiff's call for hours, declined interviewing Nemitz because she was not an "independent witness." On October 19, 2023, plaintiff visited the Saginaw Police Department headquarters, where he spoke to Detective McNab, who was responsible for overseeing McQueen's case. Plaintiff asked Detective McNab to review footage from the security cameras of an elementary school adjacent to Jackson's residence "to see if there was footage that showed what actually happened." The pertinent police report did not indicate that Detective McNab, or another member of the Saginaw Police Department, sought the requested footage or interviewed Nemitz. However, plaintiff's affidavit was attached to the aforementioned report, essentially reiterating the factual allegations concerning the underlying incident with McQueen and the resulting police investigation.

On October 19, 2023, McQueen was issued a surety bail bond for $2,500, with $375 to be paid per annum; the surety bail bond document lists Kozy Bail Bond Agency as the surety, but it is unclear who signed as the indemnitor. However, the document and the register of actions pertaining to McQueen's case indicates that the trial court set the bail bond at $10,000, with a 10% cash or surety rate. Plaintiff allegedly covered the cost of the bail bond, and the "bail bonds company kept the money Plaintiff paid as part of the cost for its services in bailing Ms. McQueen out of jail." On July 23, 2024, McQueen's trial date, the prosecution opted to dismiss the charges against McQueen after reviewing Nemitz's proposed testimony and the elementary school security footage.[1]

In a distinct incident that occurred on August 20, 2024, McQueen attempted to provide food to the children of a local named Travis Bullock near the Dollar General in Saginaw, but Bullock became aggressive towards McQueen to the point emergency services was contacted.

---

[1] According to plaintiff's initial disclosure, plaintiff filed a Freedom of Information Act (FOIA), MCL 15.231 *et seq*., request to acquire the pertinent footage, which he eventually received and shared with McQueen's counsel, who then presented the elementary school security footage to the prosecution.

After McQueen returned to her residence and disclosed what occurred to plaintiff, plaintiff drove to the Dollar General to speak to Bullock, during which Bullock "raised his voice and walked away." While plaintiff was on a videocall with McQueen, the mother of Bullock's children proceeded to thank McQueen for purchasing food for her children. As the two continued conversing, the Heinz defendants, officers employed by the Saginaw Police Department, "pulled into the back parking lot of Dollar General just behind where Plaintiff's car was parked. Plaintiff then ended his conversation with the mother and began pulling off so as not to be in the way of whatever the police intended to do in the parking lot."

The Heinz defendants followed plaintiff as he pulled out of the parking lot and turned on their police lights, resulting in plaintiff stopping his vehicle "as the officers were right behind him with their lights on." Officer Isaac approached plaintiff, as plaintiff was seated in the driver's seat of his car, and inquired why plaintiff was present at the Dollar General store. Plaintiff responded asking why he was "being pulled over." Officer Isaac "accused Plaintiff of loitering and told him he would cite him for loitering if he caught him there again." The Heinz defendants then "spoke to the group of people at the Dollar General and told them that Plaintiff was on the sex offender registry and that is probably why he was trying to speak to their children." Plaintiff alleged that the relevant police report authored by Officer Isaac did not indicate that police investigated any call regarding Bullock, "which is why the police were called to Dollar General," but the report did note that the caller claimed "one of the males threatened her." Plaintiff provided links to videorecordings of his August 20, 2024 interaction with Officer Isaac in his complaint.[2]

On September 25, 2024, plaintiff filed a complaint in the Saginaw Circuit Court contending that the City "maintained an official custom of failing to train its officers to afford the fair and just treatment during the executive investigations they conduct into whether a crime occurred," and the City "received repeated complaints of constitutional violations related to its officers' failure to properly investigate and of their affecting unconstitutional seizures of individual persons." Plaintiff further asserted that he maintained standing regarding defendants' violation of the "Fair and Just Treatment Clause," Const 1963, art 1, § 17, "where [plaintiff] would not have had to put up the money he lost bonding Ms. McQueen out and he would not have had to suffer for l0 months along with Ms. McQueen as she faced and lamented now-dismissed charges she was and is innocent of." The "Factual Allegations" section of the complaint additionally provided :

> 70. Plaintiff alleges that when Officers Isaac and Rebecca Heinz pulled Plaintiff over they were not investigating the crime they were called to investigate and did not have the requisite reasonable articulable suspicion that a crime was afoot involving Plaintiff but instead were on their own personal mission based on their own personal, prejudice, and wrong assumptions. They then disparaged Plaintiff to others with information they acquired from the Law Enforcement Information Network (LEIN).

_____

[2] The videorecordings do not depict how the alleged traffic stop first occurred, rather, the body-worn camera footage portrays the Heinz defendants' interaction with plaintiff after they approach his vehicle.

71. Plaintiff contends that he had an interest in Defendants' affording Ms. McQueen her constitutionally guaranteed right to fair and just treatment during their executive investigation into her accusations and the accusations against her and where Plaintiff personally suffered financially, mentally, and emotionally because of [the City's] failure to train its officers to afford Ms. McQueen this constitutional right[.] Plaintiff is entitled to in excess of S25,000 in damages plus any exemplary or punitive damages.

72. Plaintiff contends that he had an interest in Defendants[] affording him his constitutional right to be free from an unreasonable seizure of his person and where Defendants violated that right because of [the City's] failure to train its officers on effecting [sic] traffic stops without violating Const 1963, art 1, Sec 11[.] Plaintiff is entitled to in excess of $25,000 in damages plus any exemplary or punitive damages.

Plaintiff advanced four counts in his complaint; the first count against the City pertained to its alleged failure "to train officers to afford fair and just treatment during executive investigations," which resulted in McQueen's improper arrest, plaintiff's payment of her bail bond, and plaintiff's "extreme mental and emotional distress" for the 10 months that "the false charges were pending against her." Plaintiff advanced a second count against Officer Lautner and Detective McNab for their purported neglect in investigating exculpatory evidence, such that McQueen's lack of "fair and just treatment during the investigation into the charges . . . personally affected Plaintiff financially, mentally, and emotionally." Plaintiff asserted a third count against the City contending that despite receiving "repeated complaints about its officers' unreasonable search and seizures, . . .[the City] still failed to train its officers on how the failure to have a reasonable articulable suspicion that a crime was taking place precluded them from being able to seize a person." Plaintiff additionally stated, "This failure to train constitutes deliberate indifference to these constitutional violations and was the moving force behind the illegal stop Defendant Isaac and Rebecca Heinz effected on Plaintiff." For his last count, plaintiff contended that the Heinz defendants violated Plaintiff's constitutional rights because they conducted a traffic stop without "a reasonable articulable suspicion that Plaintiff had or was committing a crime at that moment." Plaintiff sought monetary damages under all counts.

On October 29, 2024, defendants jointly moved for summary disposition under MCR 2.116(C)(8) contending (1) "Plaintiff fails to allege he has standing to bring any viable cause of action against any of the Defendants, including but not limited to Constitutional claims and/or any statutory or common law tort claim," and (2) plaintiff's constitutional claims did not entitle him to monetary damages. On November 6, 2024, plaintiff responded to defendants' motion for summary disposition asserting, "Plaintiff Stacy Hawkins filed his Complaint for himself and definitely not for his girlfriend," and his proposed amended complaint "seeks relief pursuant to 42 USC 1983 and raises . . .individual liability claims for violations of the Fourth and Fourteenth Amendments of the US Constitution." Plaintiff further contended that he had standing to challenge defendants' improper investigation of the charges against McQueen because plaintiff was "compelled to post bond," and emotionally supported McQueen during the pendency of her criminal case. Plaintiff additionally noted that when he attempted to seek reimbursement of the bail bond at a meeting held by the City Council, his request was denied. The content of plaintiff's proposed amended

-4-

complaint is essentially identical to his initial complaint, with the exception of citing 42 USC 1983 as a basis for relief, and detailing his interaction with the City Council regarding his bail bond.

On November 22, 2024, defendants replied to plaintiff's response to defendants' motion for summary disposition arguing that (1) the proposed amendments to plaintiff's complaint "do not address Plaintiff's lack of standing, and therefore are futile," (2) "Nowhere in his Complaint does Plaintiff identify a specific policy or custom that creates a direct causal link to the injuries he asserts arose on or about October 18, 2023" to sustain a claim under 42 USC 1983, and (3) defendants were entitled to qualified immunity. On November 15, 2024, the trial court held a hearing regarding defendants' motion for summary disposition; the parties advanced arguments consistent with their respective filings. Defendants' counsel asserted that plaintiff lacked standing to advance his claims stating, "If literally every person out there who witnessed a crime, who had to bail somebody out of jail, who had to have [an] interaction with lawyers, interaction with police officers, if that was a viable claim, there would be no room in this courthouse. It would be overwhelmed with litigation." Defendants' counsel further argued that "there is no monetary claim for damages under the state constitution," and plaintiff's proposed amended complaint failed to overcome the defects presented in his original complaint regarding standing.

Plaintiff, proceeding *in propria persona*, responded, "I'm the one that lost my bail money; Ms. McQueen didn't lose her bail money. And they can—so [there's] a substantial interest in that." When the court questioned whether plaintiff was an "approved surety for the County of Saginaw" or a bail bondsman, plaintiff replied negatively. The trial court opined, "Okay. So you are not an approved surety, but, you know, and I think that that may—that creates more of an interest if you're—or, a different type of interest if you're an approved bail bondsman, and you do pay the bail." Plaintiff contended, "The $300 were not returned to me. I lost that. And only because they didn't do the investigation they were supposed to do." The court then inquired as to whether plaintiff "loaned" McQueen the funds that she used to pay the bail bond; plaintiff expressed:

> Ms. McQueen was in jail, so I produced the money. She was pregnant, with my child, so—and had a complicated pregnancy; preeclampsia, at that time. So her life could possibly be at risk, because, responding to that, if it had—if she had an issue urgently, it's not something that the jails are always equipped to do. There could be—she could bleed out. So I was very concerned about her. I went and I paid the bail. I still—I lost the money.

The court reaffirmed that plaintiff simply "gave [McQueen] the money" noting, "That's why I was asking you about whether there was a financial relationship such as a surety to the defendant." Regarding his constitutional claims, plaintiff argued that he pursued both state and federal grounds for relief, and defendants' failure to properly investigate the offenses against McQueen caused plaintiff harm. Plaintiff additionally advanced that defendants failed to address his own "Fourth Amendment violation" when the Heinz defendants stopped plaintiff without reasonable suspicion.

Following the parties' arguments, the trial court granted defendants' motion for summary disposition opining:

In this case, defendant[s] argue[] the plaintiff lacked standing to bring this case in that he filed this complaint on behalf of his girlfriend, Patricia McQueen, following her arrest on October 18, 2023, by the Saginaw Police Department.

Plaintiff alleges violations of the Michigan Constitution, which include unreasonable search and seizure, and fair and just treatment; neither of which apply to plaintiff personally.

It is of note that plaintiff does not suggest he was detained or arrested. The claims made by plaintiff relate specifically to the arrest and prosecution of McQueen. Thus, defendants argue that, plaintiff's complaint, must be dismissed as a matter of law, as the plaintiff lacks standing to bring the case.

Additionally, defendants argue they are entitled to qualified immunity.

In his Proposed Amended Complaint, plaintiff raises federal claims, but does not, address his lack of standing to bring these claims. Plaintiff relies on the Lansing School of Education Association[3] decision, where the court states a litigant, may have standing in this context if the litigant has a special injury, or right or substantial interest that will be detrimentally affected in a manner different from the citizenry at, large.

That's at 487 Mich 349. That's a 2010 case.

However, the court noted that teachers who work in a public school have a significant interest distinct from the general public with respect to the enforcement of MCL 380.1311, Subsection a, which deals with a student, assaulting an employee. As a result, it is evident why a teacher would have more substantial interest in the enforcement of these statutes, as opposed to a member of the general public, who may not be specifically impacted by this statute. The Legislative history specifically contemplates that the statute is intended to not only make the general school environment safer; but, additionally, to specifically protect teachers from assault, and to assist them in more effectively performing their jobs. These are hardly interests that are shared by the general public.

And that's a quote from the Lansing School Education Association case, at page 376.

The application of [the] standing analysis from the Lansing case is completely unrelated to this case. Plaintiff presents no evidence as to why he has a substantial interest that will be detrimentally affected in a manner different from the citizenry at large. He argues that defendants failed to afford fair and just

---

[3] *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010).

treatment during an investigation, which does not suggest that he has an interest different from the general population.

> This Court finds that the plaintiff lacks standing.

The court recognized that it was obligated to provide plaintiff with the opportunity to amend his pleadings because summary disposition was pursued under MCR 2.116(C)(8), but it stated that "the Court is not required to allow the amendment if the evidence before the Court shows that an amendment would be unjustified." The trial court resolved, "Plaintiff fails to present the Court with an amended claim that presents a valid claim on which to proceed. Plaintiff has not, prevented—presented, excuse me, sufficient evidence for the Court to find he has standing to bring these claims." On December 30, 2024, the court entered an order dismissing plaintiff's claims with prejudice under MCR 2.116(C)(8). This appeal ensued.

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "De novo review means that we review the legal issue independently, giving 'respectful consideration, but no deference' to the trial court's conclusion." *Velocity MRS Fund IV v Nextgen Pain Assoc & Rehab*, 346 Mich App 42, 46; 11 NW3d 302 (2023) (citation omitted). Defendants moved for summary disposition under MCR 2.116(C)(8). "A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint." *El-Khalil* at 159-160. "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*. When considering issues of standing, this Court further engages in de novo review. *Groves v Dep't of Corrections*, 295 Mich App 1, 4; 811 NW2d 563 (2011).

We review for an abuse of discretion a trial court's decision regarding a motion to amend the pleadings. *Wolfenbarger v Wright*, 336 Mich App 1, 14; 969 NW2d 518 (2021). A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

## III. ANALYSIS

## A. STANDING

Plaintiff argues that that he maintained standing to challenge his unlawful seizure by the Heinz defendants, and he sufficiently pleaded claims on this basis. We agree that plaintiff has alleged sufficient facts to establish standing on the two counts.

A party has standing when there is a legal cause of action and the litigant is deemed a proper party to request adjudication of the particular issue. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010). "Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing." *Id*. "A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest,

that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant." *Id*. "The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest" before seeking relief for unconstitutional conduct. *Byrd v United States*, 584 US 395, 410; 138 S Ct 1518; 200 L Ed 2d 805 (2018). "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id*. at 411.

In the present case, the trial court erred in determining that plaintiff failed to raise any constitutional claims arising from his alleged "seizure," and in concluding that plaintiff's action pertained solely to the arrest and prosecution of McQueen. Plaintiff expressly asserted two causes of action challenging the validity of the "traffic stop" in both his original complaint and his proposed amended complaint, consistently contending that the Heinz defendants lacked reasonable suspicion to stop him, whether the alleged constitutional violation was attributable to the officers' individual conduct or the City's failure to properly train its police officers. Plaintiff further submitted body-worn camera videorecordings from the Heinz defendants, and he delineated the sequence of events underlying the purported traffic stop. In conjunction with his state constitutional claims, plaintiff further pursued claims under 42 USC 1983 in his proposed amended complaint, alleging that the City and Heinz defendants violated his constitutional right to be free from unreasonable seizures. Plaintiff did so after defendants asserted that he was barred from seeking monetary damages pursuant to *Jones v Powell*, 462 Mich 329; 612 NW2d 423 (2000), and that § 1983 provided the proper vehicle for obtaining such relief—an assertion that is correct. See *Jones*, 462 Mich at 336-337 (ruling that previous caselaw "provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee," rather, a plaintiff may sue local governments or individual defendants under 42 USC 1983 "to redress a violation of a federal constitutional right").

Nonetheless, the trial court did not substantively consider the merits of plaintiff's claims concerning the alleged traffic stop; instead, it summarily concluded that plaintiff's action pertained only to defendants' purported conduct toward McQueen, despite the record indicating otherwise. Further, the court did not address whether defendants' affirmative defenses, such as qualified immunity, barred plaintiff's claims, and ultimately asserted that plaintiff lacked standing to pursue the action under state law and 42 USC 1983. Accordingly, the court erroneously awarded summary disposition on this basis.

## B. BAIL BOND

Plaintiff argues that, as the person who loaned funds to McQueen for the purpose of posting her bail bond, he had standing to challenge the constitutionality of the police's treatment of McQueen, given plaintiff's loss of the bail-bond funds and the subsequent dismissal of the charges against McQueen. We disagree.

MCR 6.106 governs pretrial release and the court rule provides, in pertinent part, that if the trial court "determines for reasons it states on the record that the defendant's appearance or the protection of the public cannot otherwise be assured, money bail, with or without conditions . . .may be required." MCR 6.106(E). MCR 6.106(E) further enables trial courts to

require the execution of a surety bond by a surety approved by court in an amount equal to "1/4 of the full bail amount," or the full bail amount, or alternatively, "bail that is executed by the defendant, or by another who is not a surety approved by the court, and secured by" varying cash deposits or designated real property. MCR 6.106(E)(1)(a) to (b). "The State Court Administrative Office's Manual for District Court Magistrates provides, 'The posting of the bail requires the creation of a contract between the defendant, the bail poster (a third party or a surety), and the court. This contract is known as a bond.' " *People v Johnson*, 293 Mich App 79, 94; 808 NW2d 815 (2011) (WILDER, J., concurring), quoting SCAO, Manual for District Court Magistrates (2011), § 4.1(A), p 1. "The manual further provides, 'There are three types of bail for which a bond is required: [1] cash bail (which includes the posting of 10 percent), [2] secured bail, or [3] unsecured bail (personal recognizance).' " *Id*. "While bail is the security required by the court for release, bond is the obligation or contract between the defendant, the bail poster, and the court." *Johnson*, 293 Mich App at 94.

Plaintiff does not contend that he served as a surety for McQueen's bail bond, nor does he assert that he was recognized by the court as a professional bondsman. Rather, plaintiff analogizes his position to the plaintiffs in *Barclae v Zarb*, 300 Mich App 455; 834 NW2d 100 (2013), asserting that his "loan" of the bail-bond funds to McQueen conferred standing to pursue his claims. Plaintiff maintains that, as in *Barclae*, the act of loaning money to a related party was sufficient to establish standing to advance claims against defendants, and to challenge defendants' inadequate investigation of the charges against McQueen. However, the circumstances in *Barclae* are markedly distinct from this case. In *Barclae*, 300 Mich App at 483-484, this Court determined that the plaintiffs possessed standing to bring a fraud claim against the defendant, even though the plaintiffs were not signatories to the debt sale agreement, because the plaintiffs provided over $1 million to a corporate entity based on the defendant's allegedly fraudulent misrepresentations concerning ownership of that entity. While *Barclae* concerned express misrepresentations made to the plaintiffs by the defendant, the instant plaintiff's alleged injury is derivative of McQueen's criminal case; the *Barclae* plaintiffs' financial loss was a direct injury attributable to the defendant's conduct, and it was not contingent on the rights or conduct of a third party.

It is unclear from the record exactly whether plaintiff's alleged loss of the bail-bond funds stemmed from McQueen's failure to appear, court procedures, statutory forfeiture processes, or an entirely unrelated reason; nonetheless, the unconstitutional treatment of a criminal defendant by police is an injury to that defendant, not to the bail poster or "loaner." Any subsequent loss of bail funds stems largely from the defendant's prosecution, not merely from the police conduct being challenged. Further, while *Barclae* involved a legally protected interest such that "the alleged wrong was a breach of duty owed personally to [those] plaintiffs," *id*. at 484, no similar duty exists between police and a bail poster regarding the lawfulness of an officer's treatment of a criminal defendant. Rather, constitutional protections are personal, and a person generally does not have standing to raise an objection to the violation of another person's constitutional rights. *People v Wood*, 447 Mich 80, 89; 523 NW2d 477 (1994); *In re Morton*, 258 Mich App 507, 509; 671 NW2d 570 (2003). We are unpersuaded that these circumstances give rise to a legally protected interest between a bail poster and the police simply because his or her funds were at risk. Additionally, the standing theory in *Barclae*, 300 Mich App at 476, was premised on fraud, which requires that the plaintiff rely on a misrepresentation and suffer a direct injury—a principle wholly unrelated to a plaintiff alleging a constitutional violation of a criminal defendant's treatment by police.

We acknowledge that MCR 6.106 "contemplates third parties depositing and retaining title to funds to secure the release of a defendant," and, the "trend in the law thus appears to acknowledge the right of a defendant to opt for another person to deposit the amount of the bond on the defendant's behalf, and for that person to retain his interest in the funds if the terms of the bond are met." *In re Forfeiture of Bail Bond*, 209 Mich App 540, 549; 531 NW2d 806 (1995). While such third parties and sureties may be afforded certain statutory rights related to the payment of a bail or bonds, MCL 765.28, these rights are not dependent on whether the police properly pursued the underlying charges; rather, such causes of action are generally related to forfeiture judgments and the apprehension of the defendant by the surety. *Calvert Bail Bond Agency, LLC v St Clair Co*, 314 Mich App 548, 554-557; 887 NW2d 425 (2016); *In re Forfeiture of Bail Bond*, 229 Mich App 724, 728-732; 582 NW2d 872 (1998). Had plaintiff challenged an issue directly related to the bail bond—such as its initial issuance, the amount required, or changes to the court rules or statutes governing the bond—he may have presented a more persuasive argument. However, plaintiff's contentions are entirely contingent on the police's alleged improper investigation of McQueen's charges, which resulted in plaintiff having to provide funds for the bond. In light of the foregoing, the trial court properly determined that plaintiff lacked standing to challenge the constitutionality of the police's treatment of McQueen, despite his loss of the bail-bond funds and the subsequent dismissal of the charges against McQueen.

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien
/s/ Mariam S. Bazzi